**In the United States District Court
for the District of Kansas**

————————

Case No. 25-cv-02037-TC

————————

DAMIN WHITE,

*Plaintiff*

v.

FIVE STAR TRUCKING, LLC, A/K/A
RICHARDSON HAULING, INC.

*Defendant*

————————

## MEMORANDUM AND ORDER

Damin White sued his former employer, Five Star Trucking, alleging that Five Star unlawfully terminated him in retaliation for engaging in a protected activity. Doc. 32 at ¶ 4.a. Five Star moves for summary judgment on all claims. Doc. 33. For the following reasons, that motion is granted.

## I

### A

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is necessary to resolve a claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. *Brown v. Perez*, 835 F.3d 1223, 1233 (10th Cir. 2016). Indeed, belaboring such disputes undermines the efficiency that Rule 56 seeks to promote. *Adler*, 144 F.3d at 670.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits

incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(a)–(c). To determine whether a genuine dispute exists, the court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee, Okla.*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues as to those dispositive matters remain for trial. *Celotex*, 477 U.S. at 324; *Savant Homes*, 809 F.3d at 1137.

**B**

This case involves a claim for retaliation under 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000e *et seq*. Doc. 32 at ¶ 4.a.[1] White asserts that Five Star terminated him for making a complaint of racial discrimination. The following facts reflect the context in which this lawsuit arose.

Five Star operates a fleet of dump trucks. Doc. 34 at ¶ 1. White, who is a black male, started working for Five Star as a dump truck operator in April 2021. Doc. 32 at ¶¶ 2.a.ii, 2.a.v. Kit Powell and Branden Powell were responsible for hiring White.[2] *Id.* at ¶ 2.a.vi. At all relevant times, Kit and Branden owned and operated Five Star. *Id.* at ¶ 2.a.iv.

White contends that he was unlawfully terminated in retaliation for reporting an incident involving him and a coworker in February 2024. That day, White and other dump truck operators were hauling construction aggregate. Doc. 32 at ¶ 2.a.viii. At approximately 2:07 p.m., White sent a text message to Kit, reporting an incident that occurred between him and another employee named Addison Dunn. *See*

---

[1] All document citations are to the document and page number assigned in the CM/ECF system. All facts are uncontroverted or, to the extent controverted, viewed in the light most favorable to White, the nonmoving party.

[2] Because they share a last name, Kit and Branden Powell will be referred to by their first names.

*id.* at ¶ 2.a.ix; *see also* Doc. 35 at 1. White told Kit that Dunn almost ran into him. In particular, he stated: "You better tell that old m&s driver in one of the strong arm trucks to slow his ass down cause he damn near ran into the back of me me following too closely, idk if he don't like black ppl or what but I will brake check him next time."[3] Doc. 32 at ¶ 2.a.ix. Kit responded: "How could someone following someone to [sic] closely have anything to do with someone being black. That makes no sense. Maybe he just wasn't paying attention. and you better not be brake checking anybody." *Id.* at ¶ 2.a.x. White replied: "because everything I have to work with him he does this." Doc. 35 at 10, ¶ 1.

Following the incident, White parked his truck in Five Star's parking lot and left work. *See* Doc. 32 at ¶ 2.a.xi; *see also* Doc. 35 at 1. When White left work, his workday was not over and he had outstanding work tasks that he could perform. Doc. 32 at ¶ 2.a.xiii. This was a violation of company policy: Five Star's employee handbook requires employees to notify their supervisor if they are unable to report to work for any reason. *Id.* at ¶ 2.a.xviii. White did not tell anyone at Five Star that he was leaving or why. *Id.* at ¶ 2.a.xvii. Although he never sought permission to leave early, White now argues that he left work early because he did not have time to return to the jobsite to finish the job before his shift ended. Doc. 35 at 11, ¶ 9. And under these circumstances, he argues, he was not required to notify Kit that he was leaving, nor had he done so in the past. *See id.* at 6, ¶ 14.

Five Star considered White's actions—leaving work while there was still work to be done—to be a resignation. *See* Doc. 34 at ¶¶ 21–22. After Kit learned that White left early, he tried to call White twice, but White did not answer either time. Doc. 32 at ¶ 2.a.xii. Later that evening, White messaged Kit about work for the next day. *Id.* at ¶ 2.a.xiv. But Kit responded: "I assumed you quit when you left early and parked it today with no call or text." *Id.* at ¶ 2.a.xv. White replied, "I was pretty upset, I wouldn't of been any good working so I left...u wasn't trying to hear me out no way soo it wasn't a reason to talk or text." *Id.* at ¶ 2.a.xvi.

Although White had initially conversed with Kit, he began communicating with Branden—and not Kit—the following day. The next morning, White messaged Branden to ask if he was going to be fired. Doc. 35 at 11, ¶ 2. Branden responded: "I have no idea what u r talking

---

[3] Most of the recounted interactions occurred on a text-messaging platform. That medium is known for its informal, quick, frequently abbreviated, and rarely edited syntax. As a result, this Memorandum and Order replicates the messages verbatim.

about." *Id.* at 11, ¶ 3. White replied: "ask kit cause he isn't texting me back, since yesterday I need to know." *Id.* at 11, ¶ 4. Later that day, White messaged Branden: "Hey he must of made he decision, because someone else is in my truck. I never said I quit, he never fired me?? So, what I'm looking at is something yall doing illegally so I'm contacting lawyers today thanks." *Id.* at 11, ¶ 5. Branden responded that he had no idea what White was talking about and that he would talk to Kit, but Branden later decided to end his communications with White in light of White's threat of litigation. *See id.* at 11, ¶¶ 6–7.

After filing a charge of discrimination with the Equal Employment Opportunity Commission, White sued Five Star for retaliation. Doc. 1 at ¶¶ 15, 18. He contends that Five Star terminated his employment in retaliation for complaining about race discrimination in violation of 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000e *et seq.* Doc. 32 at ¶ 4.a. Five Star requests summary judgment on both counts. Doc. 33. It argues that White has failed to make a prima facie claim of retaliation on both counts, that it had a legitimate business reason for terminating White, and that its reason was not pretextual. *See generally id.*

## II

White contends that he was terminated for reporting his belief that a coworker engaged in conduct that was racially motivated. Although White has made a prima facie case of retaliation, Five Star had a legitimate reason for White's termination and White lacks evidence that the proffered reason was pretext. Accordingly, Five Star's motion for summary judgment is granted.

## A

White raises his retaliation claim under Title VII and Section 1981. Title VII prohibits an employer from retaliating against an individual who has "opposed any practice made an unlawful employment practice by the statute." *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021) (quoting 42 U.S.C. § 2000e-3(a)) (quotation marks omitted). To state a Title VII claim, a plaintiff must show that he engaged in protected opposition to discrimination, that a reasonable employee would have found the employer's action materially adverse, and that a causal connection existed between the plaintiff's protected activity and the materially adverse action. *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019).

Section 1981 concerns a plaintiff's opposition to race-based discrimination. *See Parker Excavating, Inc. v. Lafarge W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017). Section 1981 mandates that "[a]ll persons within

the jurisdiction of the United States [ ] have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981. Accordingly, Section 1981 prohibits retaliation against those who oppose racial discrimination. *Parker Excavating, Inc.*, 863 F.3d at 1220.

Although White raises his retaliation claim under Title VII and Section 1981, the two claims are analyzed indistinguishably. *Parker Excavating, Inc.*, 863 F.3d at 1220; *accord Lindsay v. Denver Pub. Schs.*, 88 F.4th 1323, 1327 (10th Cir. 2023). Both statutes require a plaintiff to prove that "retaliation played a part in the employment decision." *Parker Excavating, Inc.*, 863 F.3d at 1220 (citation omitted). This can be done with direct evidence by showing "that retaliatory animus played a 'motivating part' in the employment decision," or with indirect evidence. *Id.* (citation omitted). But, where, as here, the plaintiff only has indirect evidence of retaliation, the case proceeds under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[4] *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1224 (10th Cir. 2022) (providing that the burden-shifting framework applies the same way in discrimination and retaliation cases).

Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of establishing a prima facie claim of unlawful retaliation. *Ford*, 45 F.4th at 1224. The elements to state a prima facie claim for retaliation under either Title VII or Section 1981 are indistinguishable: A plaintiff must have evidence that he engaged in protected opposition, that the defendant took a materially adverse action against him, and that a causal connection existed between the protected opposition and the materially adverse action. *Payan v. UPS*, 905 F.3d 1162, 1172 (10th Cir. 2018) (citing *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008)); *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011) ("[T]he principles set forth in Title VII retaliation cases apply with equal force in § 1981 retaliation cases.").

If the plaintiff carries the initial burden, it shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision. *Kincaid v. Unified Sch. Dist. No. 500, Kan. City, Kan.*, 94 F.4th 936, 943 (10th Cir. 2024). That burden is "exceedingly light." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017). On a

---

[4] Neither party contends that there is any direct evidence of discrimination, and each analyzes White's claims under *McDonnell Douglas*. *See* Docs. 34 at 5 & 35 at 13.

motion for summary judgment, a defendant need only "articulate a reason for the [action] that is not, on its face, prohibited and that is reasonably specific and clear." *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020) (quotations omitted). The burden is "one of production, not persuasion; it can involve no credibility assessment." *Mauldin v. Driscoll*, 136 F.4th 984, 995 (10th Cir. 2025) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).

And then, if the defendant satisfies that burden, the burden returns to the plaintiff to prove that the defendant's proffered reasons were pretextual—i.e., "unworthy of credence." *Mauldin*, 136 F.4th at 997. Once an employer satisfies its obligation to identify a lawful reason for the adverse employment decision, the burden returns to the employee to show that the reason was pretext for discrimination. *Kincaid*, 94 F.4th at 943. A plaintiff "may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1193 (10th Cir. 2018) (quoting *DePaula*, 859 F.3d at 970). In other words, a plaintiff may show that the defendant's reason is "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [it is] unworthy of belief." *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1039 (10th Cir. 2011); *see also Bekkem*, 915 F.3d at 1267.

Pretext probes the true intentions of the defendant, so the focus is limited to "whether the employer honestly believed its reasons and acted in good faith upon them." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007). A court's role "is to prevent intentional discriminatory . . . practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1312 (10th Cir. 2017) (quoting *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006)). All facts are examined "as they appear *to the person making the decision*, not as they appear to the plaintiff." *Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 655 (10th Cir. 2013) (citation and internal quotations omitted) (emphasis in original). Any doubts concerning pretext are resolved in the plaintiff's favor, but conjecture and bare allegations are not enough to show pretext. *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007).

## B

Five Star filed a motion for summary judgment on both claims, asserting that White fails to satisfy his initial burden of establishing a

prima facie case and has no evidence of pretext. Although White has established his prima facie case, he lacks evidence that Five Star's reason for terminating him was pretextual. As a result, Five Star's motion for summary judgment is granted.

**1**

Five Star first argues that White cannot satisfy any of the elements of his prima facie burden for either his Title VII or Section 1981 claim. Doc. 34 at 6–9. As noted, the elements to state a prima facie claim for retaliation under either Title VII or Section 1981 are indistinguishable: A plaintiff must have evidence that he engaged in protected opposition, that the defendant took a materially adverse action against him, and that a causal connection existed between the protected opposition and the materially adverse action. *Payan*, 905 F.3d at 1172.

Protected opposition can range from filing formal charges to communicating informal complaints to superiors. *Iweha v. State of Kan.*, 121 F.4th 1208, 1233 (10th Cir. 2024). Although no magic words are required, to qualify as protected opposition, the employee "must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [Title VII]" or Section 1981. *Iweha*, 121 F.4th at 1233–34 (alterations in original); *see Twigg*, 659 F.3d at 998 (explaining that the same principle applies in a Section 1981 retaliation case).

A plaintiff need not prove an actual violation of the statute, but must have "a reasonable good-faith belief" that he was reporting conduct prohibited by federal law. *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 890 (10th Cir. 2018) (quoting *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015–16 (10th Cir. 2004)). The reasonable, good-faith belief standard has subjective and objective components. *See Reznik*, 18 F.4th at 1261 (citing *Crumpacker v. Kan. Dep't of Human Res.*, 338 F.3d 1163, 1171–72 (10th Cir. 2003)). To meet this standard, a plaintiff's subjective belief that his complaint was made in good faith must be objectively reasonable. *See id.*

In *Reznik*, the Tenth Circuit articulated the standard governing whether a plaintiff's belief that he or she is reporting conduct prohibited by federal law is objectively reasonable. *See Reznik*, 18 F.4th at 1260. The standard considers "what a reasonable employee would understand about the law and believe in the same or similar circumstances." *Id.* at 1263. This inquiry "involves analyzing the law, the relevant attendant circumstances of [the plaintiff's] job, and the severity, pervasiveness, and duration of the alleged discrimination." *Id.* at 1264.

7

There are four distinct inquiries: the relevant attendant circumstances of the plaintiff's job, the severity of the alleged discrimination, the pervasiveness of it, and the duration of it. *See id.*at 1264–65. The less the alleged offensive conduct has to do with an employee's duties, the more reasonable it is for an employee to identify the conduct as prohibited behavior. *Id.* at 1265.

It is a close call at best whether White can establish that he engaged in a protected activity. As noted, the inquiry has subjective and objective components. It is not clear that, at the time White complained to Kit, White subjectively believed he was engaging in protected conduct, that is, opposing unlawful employment activity. It seems more likely that he was only reporting that a colleague "was treating him differently due to the fact that he was black, i.e., driving too close and dangerously to [White's] truck while working." Doc. 35 at 16. But based on the text message's invocation of race, viewing that evidence in the light most favorable to White, and the express argument White makes against summary judgment, this Memorandum and Order assumes without deciding that White subjectively believed that Dunn had violated federal law.

Likewise, it is not obvious that White's text message would satisfy the objective standard of reporting a violation of federal law. Because federal law does not typically make unlawful an employee's conduct and instead only imposes liability on the employer, it seems more likely that White's text message would be construed as evidence of a possible claim alleging a hostile work environment.[5] For a hostile work environment claim, a plaintiff must allege membership in a protected class, he was subjected to unwelcome harassment, the harassment was due to race, and the harassment was so severe or pervasive that it changed the terms and conditions of his employment. *See Young v. Colo. Dep't of Corr.*, 94 F.4th 1242, 1249 (10th Cir. 2024); *see also Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221 (10th Cir. 2015) (noting that the analysis is indistinguishable under Title VII and Section 1981).

When assessing a hostile work environment claim, facially race-neutral conduct becomes relevant in light of race-based behavior. *See Lounds*, 812 F.3d at 1227. In *Reznik*, the Tenth Circuit explained that courts evaluating a retaliation claim have concluded that retaliation "require[s] a 'lesser showing' than necessary to meet the legal standard of

---

[5] The parties' briefs do not explore what possible violations of federal law White might have thought he was reporting, opting instead to only superficially argue that he was or was not reporting an unspecified violation of federal law. *See* Docs. 34 at 6, 35 at 15–16, 38 at 9.

establishing an actual hostile work environment claim." *Reznik*, 18 F.4th at 1264 (quoting *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 285 (4th Cir. 2015)). "[A]n employee is protected from retaliation when []he opposes a hostile work environment that, although not fully formed, is in progress." *Boyer-Liberto*, 786 F.3d at 282. Even a single incident is sufficient if "it is physically threatening or humiliating." *See id.* at 284–85.

Viewed in the light most favorable to White, there is reason to find White's belief objectively reasonable. For example, he reported Dunn's conduct after claiming to have encountered it on several occasions and expressed a belief that Dunn's conduct was motivated by race. *See* Doc. 35 at 16 (citing Docs. 32 at ¶ 2.a.ix & 35 at 10, ¶ 1). This Memorandum and Order therefore assumes that White's subjective belief that he was reporting unlawful conduct that would contribute to a hostile work environment is objectively reasonable. *Cf. Bouknight v. S.C. Dep't. of Corr.*, 487 F. Supp. 449, 479 n.5 (D.S.C. 2020) (concluding that it was reasonable for the plaintiff to believe that her male supervisor's bullying directed at her was due to sex even if she could not ultimately prove the acts were based on sex).

The other two elements—materially adverse action and causation—are more readily satisfied. Five Star took a materially adverse action. *Contra* Doc. 34 at 7. Termination is an adverse action. *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008). In this case, Five Star refused to allow White to return to work because it believed he had abandoned his job. *See* Doc. 34 at ¶¶ 21–22. That is sufficient to satisfy the adverse employment element even though Five Star asserts White abandoned his job. *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1216 (10th Cir. 2003) (concluding that there was an adverse employment action even though the action was the natural consequence of the employee's choice not to return to work); *accord McInerney v. United Air Lines, Inc.*, 463 F. App'x 709, 717 (10th Cir. 2011) (citing *Wells* and concluding that a jury could reasonably find that United terminated McInerney where McInerney failed to return to work on her scheduled return date and then refused to return to work when asked). And the temporal proximity between White reporting Dunn's behavior to Kit at 2:07 p.m. on February 14, 2024, and Kit terminating him at approximately 6:00 p.m. that day establishes causation. *See Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (concluding that "[a] six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation"); *accord Spinelli v. Coherus Biosciences, Inc.*, 167 F.4th 1274, 1282 (10th Cir. 2026). Five Star does not meaningfully argue to the contrary.

## 2

Assuming White has satisfied his burden of establishing a prima facie case of retaliation, this shifts the burden to Five Star to offer a legitimate, non-discriminatory reason for its employment decision. Five Star asserts that it terminated White because he left work early—in violation of Five Star's employee handbook—without notifying anyone and there was still work available to be performed. Doc. 34 at 9 (citing Doc. 34 at ¶¶ 11, 13). That is sufficient. *See Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1320 (10th Cir. 2017) (concluding that the employer had proffered a legitimate nondiscriminatory reason for terminating plaintiff for committing a work rule violation). And White fails to argue to the contrary.

## 3

The burden returns to White, requiring that he produce evidence that Five Star's reason for termination is unworthy of belief.[6] He makes three primary arguments. Doc. 35 at 17–18. None suggest that his case should proceed to trial.

*First*, White points to differential treatment between him and other employees. Doc. 35 at 18. Generally speaking, differential treatment is a valid way to undermine pretext. To succeed on his contention, White must present evidence that he and the other employees were similarly situated and engaged in misconduct of comparable seriousness. *See, e.g.*, *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1116–17 (10th Cir. 2007); *McGowan v. City of Eufaula*, 472 F.3d 736, 745 (10th Cir. 2006) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)); *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007) (applying *Kendrick*). Similarly situated employees

---

[6] The parties dispute whether the same actor inference applies. *See* Docs. 34 at 10 & 35 at 16–17. Where, as here, the plaintiff was hired and discharged by the same person, "there is a strong inference that the employer's stated reason for acting against the employee is not pretextual." *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006). That inference is premised on the notion that a person who hired the plaintiff with full knowledge of their protected characteristics is unlikely to later terminate the plaintiff within a short period of time because of those same characteristics. *See id.* The inference does not appear to apply in this case because White's protected status—engaging in opposition to unlawful conduct—occurred well after Kit hired him. *See* Doc. 34 at ¶ 23; *Martin v. Olathe Health Sys., Inc.*, No. 11-2179, 2012 WL 2874062, at *5 (D. Kan. July 13, 2012) (declining to apply the inference because the protected status was not known when the hiring decision was made).

are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline. *Timmerman*, 483 F.3d at 1120. That is not to say every employment decision must be identical because "[a] company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct." *Kendrick*, 220 F.3d at 1233. Instead, the point is that differential treatment may imply unlawful retaliation was the motivating factor. *See Wright v. Portercare Adventist Health Sys.*, 52 F.4th 1243, 1254 (10th Cir. 2022).

White's evidence fails to identify a comparable employee that would support his pretext argument. Instead, he makes only a general assertion that Five Star "has had other employees 'leaving early' but the employees who did not engage in a protected activity like the plaintiff, were not terminated." Doc. 35 at 12, ¶ 15 (citing Doc. 35-2 at 4); *id.* at 12, ¶ 16 (citing Doc. 35-4 at ¶¶ 9–10). He fails to identify who these employees are, the conduct they undertook, their supervisor, or the context of the actions. In other words, his argument is nothing more than a conclusory statement that is insufficient to satisfy his burden of proof at the summary judgment stage. *See MacArthur v. San Juan Cnty.*, 495 F.3d 1157, 1160–61 (10th Cir. 2007) ("[M]ere conclusory allegations with no citations to the record or any legal authority for support does not constitute adequate briefing.") (quotation marks omitted) (alterations in original). Failure to identify other, comparable employees—by name, race or ethnicity, and supervisor—is fatal to a comparable-employee argument. *See Lindsay v. Denver Pub. Schs.*, 88 F.4th 1323, 1329 (10th Cir. 2023).

White's reliance on interrogatory responses reflects his evidentiary insufficiency on this point. He points to two responses where Five Star admitted that no former employee had made a complaint "reporting racial harassment and/or offensive comments and [been] subjected to or [witnessed] unfair treatment/retaliation for reporting racial harassment" and that Five Star had never fired an employee for the same or similar reasons as White. *See* Doc. 35-4 at ¶¶ 9–10. These responses do not identify any retaliatory conduct, much less from a similarly situated current or former employee. To the contrary, these responses support Five Star's position that it has never retaliated against any current or former employee for complaining about race discrimination, including White. That dooms White's claim. *See, e.g.*, *Kincaid*, 94 F.4th at 946 (concluding that the plaintiff failed to establish pretext because she "cannot point to another similarly situated employee 'who violated work rules of comparable seriousness'" (quoting *Kendrick*, 220 F.3d at 1232)).

11

Nor does White's invocation of Kit's deposition testimony demonstrate incongruent treatment between him and others. *Contra* Doc. 35 at 12, ¶ 15 (citing Doc. 35-2 at 4). The cited testimony generally describes Kit's approach to violations of the employee handbook he sees and how he and Branden, the other owner, have addressed those violations. *See* Doc. 35-2 at 4; *see also* Doc. 32 at ¶¶ 2.a.iv. Kit testified that employees usually violate the handbook by leaving early, arriving to work late, or not properly inspecting their trucks. Doc. 35-2 at 4. When an employee violates a policy, Kit testified that he typically has a conversation with the employee—which may or may not be documented—and that he decides whether to terminate the employee for committing the violation. *See id.* Kit explained that he usually confers with Branden before deciding whether to terminate an employee, but that either one of them can terminate an employee on his own. *See id.*

This testimony is unavailing because it fails to show differential treatment. To the contrary, it confirms Kit's self-described typical response process mirrored what the record shows he attempted to do here—follow up with White about his decision to leave early and then make a decision. The problem for White is that not only did he leave work early, he precluded this interaction by refusing to speak with Kit that evening. The cited testimony confirms an *ad hoc* approach that Five Star utilized and is devoid of any reason to believe that race, ethnicity, or anything other than a business judgment factored into the decision. As the Tenth Circuit has explained, pretext is not established by challenging the employer's business judgment unless a plaintiff can tie it to retaliatory intent. *See Plump v. Gov't Emps. Ins. Co.*, 161 F.4th 1222, 1236 (10th Cir. 2025) (concluding that the plaintiff's bare assertion that "the investigation was unfair because it reached the wrong result" is not sufficient to establish pretext). That is lacking because there is no indication Kit treated others, including White, differently based on claims of racial animus.

*Second*, White argues that the circumstances surrounding Kit's decision suggest pretext. Doc. 35 at 18–19. In particular, he points to Five Star's alleged equivocation about whether White was fired or quit and the lack of communication between Kit and Branden.

When assessing pretext, what matters is how the facts appeared to the decisionmakers. *Edmonds-Radford v. Sw. Airlines Co.*, 17 F.4th 975, 991 (10th Cir. 2021). In this case, that means Kit. And it does not matter whether the decisionmaker's reasoning was correct, "just whether it honestly believed in the reason for the termination." *Id.* But a plaintiff can establish pretext by showing contradictions or inconsistencies in the decisionmaker's reasoning that a reasonable factfinder could find

the reasoning unworthy of belief. *Id.*; *Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280, 1288 (10th Cir. 2022).

White's assertions of inconsistencies and contradictions surrounding his termination lack merit. *Contra* Doc. 35 at 18. To begin with, White principally asserts that he had no intention to quit and claims that he did not believe that he had abandoned his job. *See id.* at 18. That argument is foreclosed because it does not matter what White thought or intended; the focus is on the decisionmaker's intent. *See Metzler v. Fed. Home Loan Bank of Topeka,* 464 F.3d 1164, 1179 (10th Cir. 2006) (concluding that the plaintiff's subjective beliefs surrounding her termination did not raise a genuine dispute of material fact regarding the employer's stated bases for her termination). The parties have stipulated that Kit believed White abandoned his job because White left early without notifying him first. *Id.* at ¶ 2.a.xv. Then White declined to speak with Kit that evening. Even if Kit misread White's actions or made a rash decision, that is not indicative of unlawful retaliation. *See Plump*, 161 F.4th at 1236 (noting that evidence of an employer's poor business judgment, standing alone, is not sufficient to establish pretext).

The alleged inconsistency between Kit and Branden fails to persuade. Viewed in the light most favorable to White, the evidence suggests that White and Kit were engaged in the conversation that resulted in Kit construing White's actions as an abandonment of his job and then, the following day, White attempting to engage Branden on a topic Branden expressed no awareness about. It is not immediately clear—and White fails to explain—how Branden's unawareness of the situation undermines Kit's belief when making the termination decision. *See* Doc. 34 at ¶ 22 (noting Kit's deposition testimony wherein he stated that White was not allowed to return to work because he left work early without notifying anyone). In other words, White does not explain why the assessment of pretext should not be focused on Kit, who was involved in and made the determination, and instead on Branden, who was neither involved in nor aware of what had unfolded. Kit, as the parties' stipulations show, has been consistent in his view of White's conduct. And there is no evidence of inconsistency with Branden. Yet even if there were, it would not matter, as this is not a situation where the termination decision "is contingent on the independent affirmation of a higher-level manager," which would shift the pretext focus to the final decisionmaker, or one where "the final decisionmaker merely relies on possibly biased reports or conclusions of others, rather than conducting an independent investigation." *Macon v. UPS*, 743 F.3d 708, 715 (10th Cir. 2014). Accordingly, the inquiry is properly focused on Kit—the final decisionmaker.

13

*Third*, he argues that Five Star's conduct was inconsistent with its unwritten practices. Doc. 35 at 18–19. It is true that a plaintiff may demonstrate pretext by presenting evidence that the defendant acted contrary to an unwritten policy or practice. *DePaula*, 859 F.3d at 970 (citation omitted). But here, White lacks evidence of any inconsistency.

White claims Five Star had an unwritten practice that employees did not have to communicate with their supervisors if they left work early because "there was just no work or if it was just slow." Doc. 35-1 at 3. He claims that he had left work early in the past in accordance with that unwritten practice without any issue. *See* Doc. 35 at 19; *id.* at 17; *see also id.* at 3, ¶ 8 (citing Doc. 35-1 at 2–3). And, he continues, Five Star acted contrary to its unwritten policy or practice when it terminated him for leaving work early without notifying Kit first only after he raised an issue regarding race.

White's evidence fails to suggest any inconsistency. His description of the policy permitting early departures applies, by its own terms, only to situations where there was no work or it was slow. But White stipulated that was not the case: White stipulated that his departure occurred when "his workday was not over and there was work available to be done." Doc. 32 at ¶ 2.a.xiii. So, even if the policy that White describes existed (or still exists), White plainly does not fall within it because he left the jobsite without authorization when there was work left to do. Although White now tries to explain the rationale for or otherwise justify his decision to leave early, Doc. 35 at 6, ¶ 13, that explanation does not refute the point that he left when there was work left to do and he has no evidence Five Star violated any policy by terminating him for abandoning his job under these circumstances. *See Markley v. U.S. Bank, N.A.*, 59 F.4th 1072, 1084 (10th Cir. 2023) (affirming the district court's finding that the plaintiff failed to provide evidentiary support for his pretext argument to survive summary judgment).

### III

For the foregoing reasons, Five Star's Motion for Summary Judgment, Doc. 33, is GRANTED.

It is so ordered.

Date: June 12, 2026          s/ Toby Crouse
                             Toby Crouse
                             United States District Judge

14